147 So. 357

**KAMMER v. REED.**

No. 31838.

March 27, 1933.

Daly & Hamlin, of New Orleans, for appellant.

S. G. Wimberly, of New Orleans, for appellee.

LAND, Justice.

This is a suit for separation from bed and board on the ground of cruel treatment of an insupportable nature, and for the permanent care, custody, and control of the child born during the marriage.

In defendant's answer, he denies the allegations contained in plaintiff's petition, and

prays for a separation of bed and board in reconvention.

There was judgment in favor of defendant, dismissing plaintiff's demand and discontinuing the reconventional demand, because of motion made by defendant in open court.

From this judgment, plaintiff has appealed.

Plaintiff and defendant were married in the city of New Orleans on June 2, 1927. One child was born of this union, and was over the age of two years, and in the custody of plaintiff at the date of the institution of this suit, July 2, 1931.

When this suit was filed, plaintiff and her husband had been living nine months at the home of plaintiff's father and mother, 5125 Camp street, city of New Orleans, in which plaintiff's two sisters also resided.

Plaintiff testified that defendant's misconduct towards her began only two or three months after their marriage. She states that he would refuse to speak to her for four or five days at a time and that, when he did speak to her, he continually found fault without cause or provocation; that he never addressed her in a polite or affectionate manner, but always spoke to her in a rough and uncouth voice in the presence of her friends, and also in the presence of her family, if her father happened to be absent from home at the time.

Plaintiff further testified:

"Q. What was the attitude of your husband at meal times, those two meals a day that you ate with him, you and your baby, your husband and your sister, Ethel Kammer? A. He wouldn't talk to me, and when he

would, (he would) look at me as though he hated me.

"Q. Did he ever have anything to say to you during those meals about your looks? A. He called me (sobs) goofy, mutt faced, blonde nigger, and he called me and my friends and my baby sluts.

"Q. Had you given him any reason to cause him to speak to you that way? A. No reason or cause at all." Tr. p. 26.

The testimony of plaintiff is corroborated by that of her sister, Ethel Kammer, and also by that of her mother, Mrs. Amelia Harvey Kammer. Tr. pp. 26, 39.

However, no corroboration of plaintiff's testimony is necessary as to the cruel treatment received at the hands of her husband, nor as to the vile epithet of "slut" applied to her; for defendant, with his own lips, admits the truth of the charge, as shown by his own testimony, when on the stand as a witness in his own behalf:

"Mr. Wimberly: Q. Now, Mr. Reed, were you brutal and cruel and mean to your wife? A. I don't remember of being brutal. I may have been considered cruel.

"Q. I didn't say cool. I said cruel. A. Cruel.

"Q. You say you may have been considered cruel? A. I may have been considered that way.

"The Court: Q. Considered what? A. Cruel. I don't remember mistreating her.

"Mr. Wimberly: Q. Why do you say you may have been considered cruel? What did you mean?

"The Court. Q. What did you do or say, and how did you act that might have led them to consider you cruel? A. Well, I always felt that I had the family against me and I did not have a chance, and rather than start trouble I would remain silent, and I had very little to say. The best thing to do was to remain quiet and eat my meals and leave." Tr. pp. 67, 68.

This explanation sounds well, but the trouble with it is that it is an explanation that fails to explain, in the face of the following testimony of defendant:

"Q. Did your mother-in-law ever interfere in your quarrels with your wife? A. Well, no, not that I could remember." Tr. p. 69.

Nor is there any testimony in the record to show that any member of plaintiff's family interfered, at any time, in the quarrels between plaintiff and her husband. Defendant's statement that he remained silent because the family was against him is purely gratuitous, and is not supported by any other testimony in the case.

Defendant further testified:

"Q. Did you call your wife a blonde nigger? A. I never heard those expressions before. The only one I ever heard was slut. I don't remember using the others.

"Q. Did you ever call your wife a slut? A. I may have. I don't remember.

"Q. What was the occasion for your calling her a slut?

"The Court: Q. Why did you do it? A. I don't remember.

"Q. What provoked you? A. It is hard to say, your Honor. I didn't feel she was being the right kind of wife.

"The Court: See if you can develop that a little more.

"Mr. Wimberly (attorney for defendant): Q. What do you mean when you say you didn't think that your wife was the right kind of a wife? How did she make you feel that way? What did she do? A. Well we were never very close together. She had her own ideas and I had mine, and at the time I was married I had always a great ambition to have a family, and she couldn't see my idea at all, and finally consented to have one child, and I think it was outside sources that kept her from having more—just never did seem to get along in that respect.

"The Court: Q. What did you mean when you referred to her as a slut? What did you have in mind? What occasioned it? Come out straight with it. A. I can't remember.

"Q. Did it have any reference to her refusal to have children or anything of that kind? A. No. I imagine just in a sudden fit of anger.

"Mr. Wimberly (attorney for defendant): Q. Did you often say that or just only an isolated occasion? A. Well, it wasn't very many times.

"Q. Was that a private quarrel? A. I can't remember of any quarrels in particular that I could classify." Tr. pp. 68, 69.

An attempt was made by the trial judge during the taking of the testimony in the case to effect a reconciliation between plaintiff and her husband, but the plaintiff flatly refused to acquiesce in the proposal.

After this refusal, the case was ordered to proceed, and, at this juncture, defendant withdrew his reconventional demand for a separation from bed and board, and plaintiff's demand, then and there, was summarily dismissed by the court.

We feel fully justified, under the facts of this case, in maintaining the self-respect and in protecting the womanhood of the plaintiff, a lady of refinement, against such vile epithets, insults, and outrages as have been heaped upon her in this case by defendant, in his sudden fits of temper and rage.

In our opinion, the ill treatment plaintiff has received at the hands of her husband is of such a nature as to render their living together insupportable, and to entitle plaintiff to a separation from bed and board.

Plaintiff is also entitled to the permanent care, custody, and control of her minor child, May Kammer Reed, who was born October 6, 1928. A child of such tender years needs a mother's constant care, and the record discloses no good reason why plaintiff should not have the child in her permanent keeping.

It is therefore ordered that the judgment appealed from be amended by decreeing in favor of plaintiff, Mrs. May Kammer, wife of Howard W. Reed, against Howard W. Reed, defendant, her husband, a separation from bed and board, and granting to plaintiff the permanent care, custody, and control of her minor child, May Kammer Reed.

It is now ordered that the judgment as amended be affirmed, and that defendant pay all costs of this suit.