**20 So.2d 284**

### SCACCIAFERRO v. HYMEL.

No. 37544.

Nov. 6, 1944.

Rehearing Denied Dec. 11, 1944.

C. A. Blanchard, of Donaldsonville, for appellant.

Blum & LeBlanc, of Donaldsonville, and Clarence F. Favret, of New Orleans, for appellee.

ODOM, Justice.

This is a suit by a husband against his wife for divorce, on the ground that they had lived separate and apart for a period exceeding two years. Plaintiff and defendant were married on February 7, 1931, and lived together as husband and wife until July 5, 1941, when they separated, and have not lived together since. The suit was filed on July 12, 1943, more than two years after the separation took place. One child, a girl named Tillie Mae, was born of the marriage. The child is now about 11 years old.

The husband alleged in his petition that his wife had abandoned him without cause, and that the child, Tillie Mae, had been in his possession and that he had had the care and custody of her ever since the separation, and that he was entitled to the care and custody of the child during the pendency of the suit, and that, in case he should be granted a divorce, he should be awarded the permanent care and custody of the child.

The defendant answered, admitting that she and her husband had been living separate and apart for a period of more than two years, but denied that she abandoned her husband without cause. She alleged that the facts were that on June 16, 1941, she and her child accompanied the plaintiff from Donaldsonville, where they had resided, to New Orleans, and that, when they reached the City of New Orleans she asked her husband where she should go, and that he replied that he did not care where she went. She alleged in her answer that, because her husband had not provided her with sufficient funds to enable her to take up quarters elsewhere, she asked him whether she should go to her mother's home in New Orleans, and that he stated again emphatically that he did not care where she went. She alleged that, having no funds of her own with which to pay the expenses of herself and her minor child, through force of necessity she went to her mother's home in New Orleans, taking the child with her. She specifically denied that she abandoned the matrimonial domicile and voluntarily removed to New Orleans, but shows on the contrary that her husband conveyed her and her child to New Orleans and there abandoned her and went back to Donaldsonville, where they had resided.

Defendant specifically denied in her answer that plaintiff was entitled to the care and custody of the child during the pendency of the suit, and alleged that, in case a divorce was granted, she was entitled to the permanent care and custody

of the minor child, and prayed for judgment accordingly.

Defendant alleged that the separation was not caused through any fault of hers, but on the contrary was caused by the fault and wrongdoing of her husband.

Defendant alleged in her answer that during her entire married life her husband had been cruel to her, that on one occasion he had attempted to strike her, that he cursed and abused her, and that he was in the habit of drinking intoxicating liquors to excess, and that his conduct toward her generally was abusive, and that he had neglected her and on certain occasions had failed to provide sufficient support for her and her child, and in paragraph 14 of her answer she alleged that for the reasons above stated her husband should be deprived of the custody of the child, and that "your defendant desires to obtain permanent care, custody and control of said child".

She alleged that she was in necessitous circumstances and that plaintiff should be ordered to pay alimony for the support of herself and the child, and that she was entitled to attorney's fees in the sum of $150. She prayed that plaintiff's demands be rejected and for alimony and for attorney's fees in the sum of $150.

There was judgment in the lower court in favor of plaintiff, granting to him a divorce, and judgment in favor of the defendant and against the plaintiff, "decreeing to defendant the permanent care, custody and control of the minor child, Tillie May Scacciaferro", and ordering plaintiff to pay defendant the sum of $40 per month for the support, maintenance, and education of the minor child, and further ordering that the plaintiff pay defendant's attorney's fees in the sum of $150. From this judgment the plaintiff appealed.

■ Counsel for plaintiff objected to the introduction of any testimony by defendant in support of her demands, on the ground that she did not assume the position of plaintiff in reconvention. The lower court overruled the objection. The ruling was correct, because she set up in her answer that she was entitled to the care and custody of the child, that she was entitled to alimony, and that the plaintiff should be ordered to pay her a stipulated sum each month for the support and education of the child, and her prayer was in accordance with her allegations. See Person v. Person, 172 La. 740, 133 So. 225.

Defendant did not contest plaintiff's right to a divorce. The only issues, therefore, which we are called upon to decide are whether the defendant is entitled to the permanent care, custody, and control of the minor child of the marriage, whether the amount of $40 per month, which the judge ordered plaintiff to pay for the support and education of the minor child, is excessive, and whether the judge should, under the circumstances, have ordered plaintiff to pay defendant's attorneys a fee of $150.

■ The testimony shows beyond question, we think, that the judge did not

err in awarding to defendant the permanent care, custody, and control of the minor child, Tillie Mae. The plaintiff admitted that he had no home of his own in which to rear the child, and that he lived in the home of his father and mother, where the child had been during the two years which elapsed between his separation from his wife and the time the suit was tried. According to the testimony, his work is of such a nature that the only time he could possibly spend with the child would be at nights. Necessarily, therefore, he could have but little to do with the care, training, control, supervision, and rearing of the child. All this he left to his mother. The testimony shows—in fact, it is admitted—that plaintiff's mother and father are devoted to the child and are properly caring for her; that plaintiff's father and mother own their own home in Donaldsonville, which is commodious and well kept; that the child was at the time of the trial, and had been during the entire period of the separation of her father and mother, attending a Catholic school conducted by Sisters. The child's father and mother are both of the Catholic faith, and the mother testified that the child's educational and religious training was entirely satisfactory to her.

The mother of the child testified that, at the time of the birth of the child and for a number of years thereafter, she and her husband lived near the home of his parents, and that his parents, especially his mother, had attempted to take charge of the child and keep her with them, and that the grandmother had taught the child to ignore her, the mother, and to refer to her, the mother, as "She" and "Her" and "Country", and in other ways attempted to win the child away from her mother. The grandmother testified that it was true that the child had spent a great deal of time with her in her home, both day and night, but she denied that she had attempted at any time to influence the child to ignore her mother or treat her disrespectfully. The mother of the child testified that she was "pulling one way" and her husband's parents were "pulling her another way".

The testimony satisfies us, as it did the trial judge, that there was considerable discord between the mother of the child and her husband's parents, and that the mother had reason to believe, during the years when she and her husband were living together, that she was being ignored in the rearing of her child and that the grandmother was attempting to take the place of the mother and to supersede the mother in the affections of the child.

The defendant has been living with her mother and her brother ever since she and her husband separated, and expects to remain with them and to take the child to their home in case she is granted the care and custody of her. It is shown that her mother and her brother live in a modern, two-story house, with three large bedrooms and a bath upstairs, and a living room, dining room, hall, and kitchen downstairs, located in a desirable residential

section of the city. Her brother, Malcolm Hymel, testified that he was head of the household, that his regular salary was $275 per month, and that he had recently received a bonus of $1,000; that he was amply able to provide all the necessities of life for his mother and his sister's child; that he was godfather of the child, and that, if the child were permitted to live with him and his mother, he would see that she was well provided for, educated, and properly trained religiously; that there was located within a block of his home a Catholic church and school, and that he would see that the child attended this church and school. He and his mother testified that they attended church regularly, and his mother testified that, if the child and the child's mother lived with her and her son, she would look after the child and take care of her during the absence of the child's mother, and not only would she do that—she would be glad to do so, and promised while on the stand that she would do everything within her power to see that the child was taken care of and reared and educated properly.

The child's mother testified that she was at work, earning $65 per month; that, being so employed, she would necessarily have to be away from the home at certain hours during the day, principally the hours in which the child would be away from home attending school; that she would give the child all the attention that any mother could give a child during all the hours she was not employed, and that, in case the child should be at home while she was at work, the child's grondmother was physically able to, and would, give to the child all the attention that she needed. It therefore clearly appears that, if the mother is given the custody of her child, the child will be properly looked after and cared for in a comfortable home, and will have all the advantages of church and school which it would be possible for her to have anywhere.

The husband alleged that the mother had voluntarily abandoned the child, but he failed to support that allegation with proof. The testimony shows that the father came to New Orleans, took the child without the mother's consent, and carried her to Donaldsonville. He further alleged that the mother's conduct showed that she cared but little for the child; that, during the two years in which she was separated from him, and while she was living in New Orleans and he and the child in Donaldsonville, she had never visited her child and had made no effort whatever to have the child restored to her custody. It was not shown that the mother had visited the child, but the mother testified that the reason she had not done so was that she knew that she was not welcome in the home of her husband's parents. And it is also shown that she had repeatedly written the child and had sent her Easter and Christmas presents. The mother gave a perfectly reasonable explanation as to why she had taken no legal steps to obtain the custody of her child. She testified—and this is not disputed—that, shortly after the father

of the child took her from New Orleans back to Donaldsonville, she consulted an attorney as to what steps she should take in order to get the child; that the attorney advised her that her only means of obtaining the custody of the child would be to sue the father for a separation, and ultimately for a divorce, and to demand in her suit the custody of the child. She then consulted her spiritual advisor, a monsignor, as to whether she should take such steps, and she was counseled by him against such procedure. Thereafter she abandoned all hope of obtaining custody of her child until such time as her husband might take steps against her for divorce, which steps, she said, he proposed to take as soon as possible.

There is nothing in the testimony to show, or even to indicate, that the mother ever lost her love and affection for her child, or that she ever abandoned hope of having the child restored to her permanently. And we have every reason to believe that, if the child is restored to the custody of the mother, the child will have the best of care and attention. As we have already said, the father has no home of his own in which to rear the child, and, if he is permitted to retain custody of her, the rearing of the child will be entrusted to his mother; so that, in the last analysis, the question really is whether the child should be reared by her own mother or by her paternal grandmother. Under the circumstances shown to exist in this case—and especially in view of the fact that the mother of the child is shown to be worthy in every respect and that she and her brother, who is godfather of the child, are able and willing to take care of her—we hold, as we have always held under like circumstances, that the mother is entitled to the permanent care and custody of her child. Higginbotham v. Lofton, 183 La. 489, 164 So. 255; Kammer v. Reed, 176 La. 1091, 147 So. 357; Newson v. Newson, 176 La. 694, 146 So. 472; O'Dwyer v. Natal, 173 La. 1075, 139 So. 486; Brewton v. Brewton, 159 La. 251, 105 So. 307; Hayden v. Hayden, 154 La. 716, 98 So. 162.

■ The trial judge refused to allow the defendant to obtain alimony for herself. That ruling is correct, not because the defendant was at fault in abandoning her husband, because she was not at fault; but is correct because the testimony shows that she is now at work, earning $65 per month, and is therefore not in necessitous circumstances. But the judge ordered the father to pay to the mother $40 a month for the support, maintenance, and education of the child. We think this award is slightly excessive for two reasons, the first being that it was not shown that amount was necessary, and the second being that we are not satisfied from the testimony that the father is able to contribute that amount. The testimony shows, however, that he has been giving to his mother sometimes $30 and sometimes $35 a month for the support of the child. It appears, therefore, that the father is able to contribute $30 per month

to the support of the child, and that such amount is sufficient under the circumstances.

██ The trial judge ordered the plaintiff to pay defendant's attorneys a fee of $150. We think the judge erred in his ruling. The defendant did not allege in her answer that she had employed counsel to represent her, or that she had obligated herself to pay attorney's fees in any amount, although she did allege that she was entitled to attorney's fees and prayed for judgment against the plaintiff for $150 as attorney's fees. But her counsel introduced no testimony at all to show that services rendered by them were worth $150 or any other sum. No evidence was introduced to show what the wife had paid her attorneys, or whether she had paid them anything, or whether she had agreed to pay them anything. Under like circumstances, this court has refused to allow attorney's fees. Arnold v. Arnold, 186 La. 323, 172 So. 172.

For the reasons assigned, it is ordered that the judgment appealed from, ordering the husband to pay the wife's attorneys $150 as a fee, be set aside, and her demand for the payment of attorney's fees is dismissed as in case of nonsuit. It is further ordered that the judgment be amended so as to reduce the amount which the plaintiff was ordered to pay his wife for the support and maintenance of the minor child from $40 per month to $30 per month, and, as thus amended, the judgment is affirmed.